John B. GENTRY, Sr., et ux., Petitioners,

v.

CREDIT PLAN CORPORATION OF HOUSTON et al., Respondents.

No. B–4999.

Supreme Court of Texas.

Sept. 24, 1975.

Rehearing Denied Nov. 5, 1975.

Momberger & Momberger, Edwin H. Momberger, and Marie W. Momberger, Houston, for petitioners.

Bernard & Bernard, D. R. Bernard, Houston, for respondents.

WALKER, Justice.

This is an unreasonable collection efforts case. The events giving rise to the suit occurred on or about February 7, 1969. Shortly thereafter John B. Gentry and wife, Eileen Gentry, plaintiffs, filed suit against Joe Assad and Credit Plan Corporation of Houston. Colonial Finance Corporation was joined as a defendant on May 17, 1972, more than two years after the alleged cause of action accrued, and Kelcor Corporation was joined as a defendant about eight months later. Colonial was merged into Kelcor during the pendency of the suit, and it is undisputed that Kelcor assumed all of Colonial's liabilities. The questions to be decided are: (1) whether Credit Plan was the alter ego of Colonial; and (2) if so, whether the suit against Credit Plan stopped the running of the statute of limitations in favor of Colonial.

The trial court rendered judgment on the verdict and on the basis of its conclusion that Credit Plan was, as a matter of law, the alter ego of Colonial and Kelcor.[1] Plaintiffs were given judgment against Credit Plan, Colonial, Kelcor and Assad, jointly and severally, for actual damages of $69,747.35 and exemplary damages in the amount of $69,447.35. The Court of Civil Appeals concluded that the suit against Colonial and Kelcor is barred by limitation. It reversed the judgment of the trial court as to those defendants and rendered judgment that plaintiffs take nothing against Colonial and Kelcor. The judgment of the trial court against Assad and Credit Plan was affirmed. 516 S.W.2d 471. John B. Gentry died after oral argument here. A sugges-

1. Two findings of the jury bearing on the alter ego issue were favorable to plaintiffs. These findings are not mentioned in the opinion, because their meaning is not entirely clear to us and also because we agree with the trial court that on the present record Credit Plan was the alter ego of Colonial as a matter of law.

tion of death has been filed, and the case will proceed to judgment as provided in Rule 369a, T.R.C.P. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

By their Point No. 73 in the Court of Civil Appeals, Colonial and Kelcor contended that there is no evidence to warrant the conclusion that Credit Plan was the alter ego of Colonial. The Court of Civil Appeals did not reach that question, but under our view of the case it is necessary for us to do so. We consider it first.

A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders. On the other hand where management and operations are assimilated to the extent that the subsidiary is simply a name or conduit through which the parent conducts its business, the corporate fiction may be disregarded to prevent fraud or injustice. Unlike a suit for breach of contract, the plaintiff in a tort case does not have the burden of justifying a recovery against the parent when he willingly contracted with the subsidiary. The problem in such a case is essentially one of allocating the loss. It is not necessary to establish fraud, and the financial strength or weakness of the subsidiary is an important consideration. See *Bell Oil & Gas Co. v. Allied Chemical Corp.*, Tex.Sup., 431 S.W.2d 336; *First Nat. Bank v. Gamble*, 134 Tex. 112, 132 S.W.2d 100; 18 Am.Jur.2d, Corporations § 17; Douglas and Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193; Ballentine, Separate Entity of Parent and Subsidiary Corporations, 14 Calif.L.Rev. 12.

Colonial caused its President, Secretary, and Treasurer to incorporate Credit Plan in 1963. The capital stock consists of 25,000 shares of the par value of $1.00 per share. Colonial became the owner of 22,500 shares, and the remaining 2,500 shares were registered in the name of the person who was manager at the time of Credit Plan's office in Houston. The manager executed a note for $2,500.00 to Colonial, and Colonial reserved the right, which was printed on the stock certificate, to repurchase the stock when the owner resigned or retired as manager. Upon termination of the manager's employment, the stock certificate and note were cancelled and the stock was registered in the name of the new manager, who executed his note for $2,500.00 to Colonial. This occurred several times, and none of the notes was ever paid. The manager never attended a stockholders' meeting, and it is not clear from the record that a meeting of the stockholders was ever held.

Colonial owned a number of other subsidiaries, including Credit Plan, Family Plan Corporation, Mutual Plan Corporation, Kelly Acceptance Corporation, and at least two others that remain unnamed here to avoid confusion. The same persons were officers and directors of Colonial and Credit Plan. Kelly Acceptance is a management corporation that was organized in 1963. All of its stock was owned by Colonial, and Kelly Acceptance performed management functions for all of the Colonial subsidiaries. Kelly Acceptance maintained the books, records and accounts of Colonial and Credit Plan.

Colonial and its subsidiaries maintained the same corporate office and had the same registered agent. The directors of Colonial and Credit Plan met at the same time and place. Colonial and Credit Plan were engaged in the same business, their charters containing the same or similar purpose clauses. Their business consisted of making loans on the security of automobiles, furniture and other personal property, and their only income was from insurance premiums and interest on loans. A single loan office was operated in the name of Credit Plan, and another office was operated in the name of each of the other subsidiaries except Kelly Acceptance. In most instances the offices were in different cities. Managers of the several offices were interviewed, evaluated and selected by C. K.

Wingo, who was President of Colonial and of each subsidiary. From time to time managers were transferred from one loan office to another, and in at least one instance two of the loan offices were combined. President Wingo received no salary or reimbursement of expenses from Credit Plan.

Money with which to do business was borrowed at different times from banks and was also obtained by the sale of Colonial's debentures. More recently the money was obtained from Walter E. Heller & Co. of Chicago. The loan papers of the several subsidiaries were discounted with Heller. Colonial and all subsidiaries guaranteed payment of all notes transferred to Heller. Money obtained from the sale of loans by Colonial and its subsidiaries to Heller was sent to Kelly Acceptance, which then apparently made advances to Credit Plan and other subsidiaries as required. Kelly Acceptance maintained a ledger showing "Amounts due from Credit Plan Cor. of Houston." This ledger contained three columns, which evidently reflected amounts advanced, amounts repaid, and a running balance. On the ledger sheet in the record, the balance varies from slightly over $700,-000.00 to more than $950,000.00.

Consolidated tax returns were filed for Colonial and its subsidiaries, and the record contains consolidated balance sheets covering the operations of the parent company and its subsidiaries. According to these consolidated balance sheets, Colonial and its subsidiaries together had net assets of more than $500,000.00 during the years 1968 to 1972. However, Credit Plan has been operating at a deficit continuously since 1964. The value of its stock at the close of fiscal year 1971 was "a deficit in retained earnings of $118,794.00." Its deficit on June 30, 1969, shortly after the cause of action in the present case accrued, was more than $80,-000.00. Apparently no attempt has been made to enforce the statutory requirement that each Texas loan licensee maintain net assets of at least $25,000.00, and Credit Plan's license has been renewed annually.

See Art. 5069–3.05, V.A.C.S. Neither Credit Plan nor Colonial carried liability insurance.

This suit was filed in 1969. During that same year the stockholders of Colonial exchanged their stock for an equal number of shares of Kelcor Corporation, and the officers and directors of Colonial became officers and directors of Kelcor. Colonial eventually merged into Kelcor in 1973, and all of Colonial's liabilities were assumed by Kelcor.

It appears from the minutes of the meetings of Colonial's directors that the subsidiaries were regarded not as separate business entities but as simply offices of the parent company. An executive committee was appointed to meet every 90 days and "discuss business of Colonial Finance Corp. and its subsidiaries." President Wingo was granted a bonus of ten percent of the income of each corporation, the bonus being allocated between the companies on the basis of their respective net incomes. The directors of the parent company also increased President Wingo's salary, declared cash and stock dividends, approved official expenses and financial reports, appointed auditors, learned of changes of personnel in the several offices, heard reports from the President concerning arrangements for lines of credit, and were advised that the executive committee had unanimously approved a profit sharing plan for the employees of Colonial and its subsidiaries. After the merger, the directors of Kelcor learned that certain managers had been changed, and that the office of a subsidiary had been consolidated with that of Credit Plan in Houston. On one occasion they approved a new employee insurance contract as well as certain health and accident coverage for the officers of Kelcor and its subsidiaries. In some instances there were joint meetings of the directors of Kelcor and its subsidiaries.

By way of contrast, the minutes of the meetings of Credit Plan's directors deal almost entirely with formalities. At the outset an application for a license under the

Texas Loan Act was authorized, a statutory agent was appointed, and the president was authorized to handle bank loans. For many years thereafter, the only action taken was to discuss the "progress" of Credit Plan and consider a financial report submitted by accountants.

■ It might be helpful to have additional facts concerning the operations and records of Colonial, Credit Plan and Kelly Acceptance. From our study of the record, however, we are inclined to believe that the absence of certain details is probably due to the reluctance of defendants and their officers to supply information rather than to any lack of diligence on the part of counsel for plaintiffs. Be that as it may, all of the evidence points to one conclusion: that Credit Plan was operated and used by Colonial not as a separate entity but simply as a name under which Colonial did its business. There is no evidence to the contrary. In view of these circumstances and Credit Plan's financial situation when the suit arose and at the present time, we agree with the trial court that Credit Plan was, as a matter of law, the alter ego of Colonial.

In holding that the suit against Colonial and Kelcor is nevertheless barred by the two-year statute of limitations, the Court of Civil Appeals reasoned that Credit Plan, Colonial and Kelcor are to be regarded as entirely different persons. It applied the general rule that the filing of suit against one person does not stop the running of limitations in favor of another person who is later joined by filing an amended petition. The statute continues to run in favor of the latter until the filing of the amendment. See *First State Bank & Tr. Co. v. Ramirez*, 133 Tex. 178, 126 S.W.2d 16; 51 Am.Jur.2d, Limitation of Actions §§ 272 et seq.; Annotation, 8 A.L.R.2d 6, 112. The intermediate court regarded it as immaterial that Colonial was using Credit Plan as its alter ego. It observed that a plaintiff does not, by suing an agent or employee, toll the

running of limitations in favor of the principal or employer.

The author of the annotation in 38 A.L. R.3d 1102 points out that the courts have developed a number of formal rules or theories for holding a parent corporation liable for the acts of its subsidiary. These rules or theories are rarely, if ever, represented as exclusive in application. They include agency, estoppel, alter ego, instrumentality and identity. The author further notes that there is little difference in the thrust of the alter ego, instrumentality and identity theories. Agency and estoppel differ from the other three, however, in that: (1) they involve principles of law well developed outside the field of disregard of corporate entity, and (2) the application of either the agency or the estoppel theory does not necessarily involve any disregard of the corporate entity. See 38 A.L.R.3d 1102, 1110 et seq.

■ The purpose of the court in cases of this nature is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice; and that purpose should not be thwarted by adherence to any particular theory of liability. Colonial was in fact engaged in business in the name of Credit Plan, and we hold that they are to be regarded as identical for the purpose of determining whether the present suit is barred by limitation. The filing of suit against Credit Plan stopped the running of the statute in favor of Colonial. See *Mirabito v. San Francisco Dairy Co.*, 8 Cal.App.2d 54, 47 P.2d 530.[2] The suit against Colonial was not barred when it merged into Kelcor, and Kelcor was joined as a defendant shortly after plaintiffs' cause of action against it arose. It follows that the suit against Colonial and Kelcor is not barred by limitation.

Credit Plan and Assad filed an application for writ of error raising a number of questions that were decided against them by the Court of Civil Appeals. Their appli-

**2.** We are not suggesting that under our practice a defendant may be added by the trial court after a judgment has become final on appeal.

**576**

cation was granted because of the granting of the Gentry application. After carefully considering all points of error presented there, it is our opinion that none warrants a reversal of the trial court's judgment.

The judgment of the Court of Civil Appeals is reversed, and that of the trial court is affirmed.