Dr. Brendan M. MILES,
Plaintiff-Appellant,

v.

AMERICAN TELEPHONE &
TELEGRAPH COMPANY,
Defendant-Appellee.

No. 82–1533
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 22, 1983.

Wm. Andress & Associates, Wm. Andress, Jr., Dallas, Tex., for plaintiff-appellant.

W. Edward Walts, II, Dallas, Tex., for defendant-appellee.

Before CLARK, Chief Judge, POLITZ and GARWOOD, Circuit Judges.

POLITZ, Circuit Judge:

Brendan M. Miles appeals the summary judgment dismissal of his tortious invasion of privacy suit against American Telephone and Telegraph Company (AT & T). The district court granted AT & T's motion on the ground that AT & T was not liable as the alter ego of its wholly-owned subsidiaries, Southwestern Bell Telephone Company (Southwestern) and South Central Bell Telephone Company (South Central). Finding no error of fact or law, we affirm.

## Factual Background

Brendan Miles and his wife Elizabeth separated in October 1975. Mrs. Miles left the matrimonial domicile in Lafayette, Louisiana and took up residence with the family of Mrs. Chris Williams in Longview, Texas. Sometime during the spring of 1976, Brendan Miles engaged detective agencies and attorneys in Shreveport, Louisiana and in Longview to place his wife under surveillance, preparatory to litigation in which he planned to seek a divorce and custody of the couple's three small children. Miles communicated by telephone with the investigators and attorneys on a regular basis during the spring and summer of 1976.

In October 1976, Mrs. Miles was informed of her husband's plan to sue for divorce and custody of the children. The information was conveyed in an anonymous telephone call to the Williams house, a call received by Mrs. Williams' teenage daughter. To determine the identity of the caller, Mrs. Williams solicited the assistance of her niece, Brenda Morphew, an employee in Southwestern's security department in Dallas, Texas. Morphew purportedly traced the anonymous call to Miles' Lafayette residence, secured a list of his long-distance toll records from South Central and furnished them to Mrs. Miles. By calling the numbers, Mrs. Miles learned of her husband's telephone contacts with the offices of the attorneys and private investigators.

In January 1979, Miles filed this diversity action against AT & T and Morphew, seeking damages for tortious invasion of an asserted right to privacy. Neither Southwestern nor South Central was made a party-defendant; Miles would hold AT & T liable for their actions and that of Morphew under an alter ego theory. AT & T moved for summary judgment, contending that there was no basis for disregarding the separate corporate identities of itself and its subsidiaries. AT & T and Morphew jointly moved for dismissal on the grounds that the complaint failed to allege a viable cause of action, a motion the district court denied because the record did not conclusively establish that Miles was without a cognizable right to privacy under Texas law. The court granted AT & T's motion, having determined that no material issue of fact existed with respect to its alter ego status. Miles then voluntarily dismissed with prejudice his claim against Morphew. The sole issue addressed on appeal is the grant of summary judgment to AT & T.[1]

## The Summary Judgment Vehicle

Miles argues that the district court erred in granting summary judgment to AT & T, since there is a factual dispute as to the degree of control exercised by AT & T over Southwestern and South Central. Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." In gauging the propriety of the district court's grant of summary judgment, we invoke the same legal standards as those that bind the district court. *Impossible Elec. Tech. v. Wackenhut Prot. Systems,* 669 F.2d 1026 (5th Cir.1982). We must view the evidence in the light most favorable to the opposing party, resolving all reasonable doubts concerning the facts in his favor.

---

1. Because of our disposition of the case, we do not address Miles' contention that his claim of tortious invasion of privacy is cognizable under Texas law. Nor do we consider AT & T's contention that plaintiff's voluntary dismissal with prejudice of his claim against Morphew automatically results in a dismissal of the action against it as the alter-ego employer. Those issues remain for another case and another day.

*Breen v. Centex Corp.,* 695 F.2d 907 (5th Cir.1983). We may not weigh the probative value of the evidence adduced, nor decide any factual issues we might discern in the record, but are instead limited to a determination of whether a genuine issue of material fact remains for disposition " 'so as to insure that factual issues will not be [decided] without the benefit of the truth seeking procedures of a trial.' " *Id.* at 910 (*quoting from Southern Distributing Co. v. Southtown, Inc.,* 574 F.2d 824, 826 (5th Cir.1978)).

### Alter Ego

AT & T argues that it cannot be held accountable for tortious conduct of Southwestern, South Central, or their employees because the evidence establishes its lack of control over these subsidiaries. Conversely, Miles maintains that AT & T's pervasive influence over the regional companies, all integral components of the unitary Bell System, dictates the conclusion that the parent corporation is indeed the alter ego of its subsidiaries.

■ As traditionally applied in the parent-subsidiary context, the alter ego doctrine permits the imposition of liability upon the parent company for torts and contractual obligations of its subsidiary, where the parent exercises actual control over the subsidiary and operates it as a mere instrumentality or tool. Under these circumstances, the subsidiary is merely a conduit through which the parent conducts its business. *Edwards Co., Inc. v. Monogram Industries, Inc.,* 700 F.2d 994 (5th Cir.1983); *Bay Sound Transportation Co. v. United States,* 350 F.Supp. 420 (S.D.Tex.1972), *aff'd,* 474 F.2d 1397 (5th Cir.1973); *see Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571 (Tex.1975); *Hanson Southwest Corp. v. Dal-Mac Construction Co.,* 554 S.W.2d 712 (Tex.Civ.App.—Dallas 1977, *writ ref'd* n.r.e.). Texas courts are loathe to merge the separate legal identities of parent and subsidiary unless the latter exists as a mere tool or "front" for the parent, or the corporate fiction is utilized to achieve an inequitable result, or to conceal fraud or illegality. *Edwards Co., Inc.; Gentry.*

However, the Texas courts have been less reluctant to disregard the integrity of related corporations in tort, as contrasted with contract, cases. This differential treatment can be attributed in major part to the element of choice inherent in a contractual relationship. *Texas Indus., Inc. v. Lucas,* 634 S.W.2d 748 (Tex.Civ.App.—Houston 1982); *Hanson Southwest Corp.*

Although the attitude toward judicial piercing of the corporate veil is more flexible in tort, the legal precepts governing both tort and contract suits are substantially the same. *Hanson Southwest Corp.* Proof of an identity of shareholders or of corporate directors and officers, or of domination by the parent of its subsidiary's affairs, will not justify treatment of the two as one business unit. *Gentry.* Nor does the parent's ownership of 100 percent of the subsidiary's stock alone defeat their separate existence. *Edwards Co., Inc.*

■ A variety of factors must instead be evaluated to determine whether "management and operations are assimilated to the extent that the subsidiary" is nothing more than a mere adjunct of the parent. *Id.* at 573. As expounded by the late Justice William O. Douglas and Professor Carroll M. Shanks in their seminal article, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193 (1929), frequently cited by the Texas courts as furnishing an invaluable analytic aid, *see, e.g., Gentry; Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336 (Tex.1968); *Texas Indus., Inc.; State v. Swift & Co.,* 187 S.W.2d 127 (Tex.Civ.App.—Austin 1945, *writ ref'd* n.r.e.), such factors include whether: (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of

the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit. Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations. *See Bay Sound Transp. Co. (cited in Texas Indus., Inc.).*

Deposition testimony of Thomas O. Davis, AT & T's Assistant Secretary, provided the district court with an overview of the relationship between AT & T and its subsidiaries, Southwestern and South Central, from which the court observed:

> The wholly owned subsidiaries contribute a fixed percentage of their gross revenue to AT & T, these "license" payments are a major source of AT & T's revenues, there is extensive cooperation among the subsidiaries with respect to interstate, or intersubsidiary telephone calls, AT & T expects and anticipates such cooperation among the subsidiaries, AT & T sells a Wide Area Telephone System ("WATS") to customers and the actual use of the system involves more than one subsidiary, AT & T also sells an "incoming WATS" or "800 System" to customers which similarly involves more than one subsidiary when in operation, and AT & T has a master labor contract with the Communi-

cations Workers of America covering approximately 525,000 workers, some of whom are employees of the subsidiaries, including 12,000 workers for Southwestern Bell.

AT & T does not promulgate uniform policies for its subsidiaries' daily operations, and does not maintain a pension retirement fund covering subsidiary employees.

Davis further stated that AT & T and Southwestern shared one director; AT & T and South Central shared none. South Central's business transactions with AT & T were predicated upon two contracts: the licensing agreement noted above and a revenue agreement under which the two participate jointly in rendering a variety of communication services, and divide the resulting profits. Davis further averred that South Central manages its own commercial and financial affairs independent of AT & T's supervision and control, including the preparation and maintenance of customer toll records.[2] As to the nature and extent of the ties binding AT & T and Southwestern, letters exchanged by officers of both companies reflect that Southwestern, along with other Bell subsidiaries, was required to implement the Bell System's overall goal of providing measured service to business and residential customers. Several AT & T officers conveyed their criticisms and recommendations to their Southwestern counterparts in order to encourage attainment of this goal. Whatever interchange of cus-

---

**2.** Factors cited by the district court as demonstrative of South Central's autonomous operation include its:

(1) selection of the banks with which it does business;

(2) selection, training, and supervision of its own personnel;

(3) under the authority of the Federal Communications Commission and the public utility commissions in the state where it operates, determination of rates to be tariffed with such bodies for its various services and equipment;

(4) preparation of its own budget;

(5) determination of its own construction requirements;

(6) contracting with independent telephone companies in the states in which it operates and making revenue settlements with them;

(7) preparation of, publication and distribution of its own annual report and other publications for public relations and related purposes;

(8) publication of its own employee newspapers and other employee publications;

(9) responsibility for its own accounts receivable and accounts payable;

(10) liability for the satisfaction of judgment and other claims against it;

(11) determination of its purchasing policies and procedures, and purchase of real property, equipment and supplies as needed in accordance with those policies and procedures;

(12) determination and implementation of its own sales, marketing and advertising procedures and selection of its own advertising and public relations agencies and consultants.

tomer records occurred between South Central and Southwestern bore no relation to AT & T, and was not effected pursuant to the latter's policy or practice.

■ Miles presented no evidence to buttress his conclusional opposition to AT & T's motion. *See White v. United Parcel Service*, 692 F.2d 1 (5th Cir.1982) (non-movant obligated to meet movant's affidavits with opposing affidavits or other competent evidence setting forth specific facts to show the existence of triable issues of fact). When measured against the previously defined principles of Texas law, the undisputed evidence demonstrates the absence of any issue of material fact as to AT & T's status as South Central's alter ego. There is no question that this wholly-owned subsidiary, albeit engaged in cooperative business ventures with AT & T and bound by the parent's overall policies, functions autonomously in terms of the conduct of its business and financial affairs. While the evidence bearing on AT & T's relationship with Southwestern is considerably less detailed, we are persuaded that its operations are sufficiently independent of the parent's control to preclude a judicial piercing of AT & T's corporate veil. Both subsidiaries are financially able to satisfy a monetary judgment, and there is nothing in the record to suggest that our refusal to merge the various corporate identities would work an injustice upon the plaintiff.

Miles charges that the district court, in relying upon the holding by the Supreme Court of Texas in *Bell Oil & Gas Co.,* erroneously introduced the fraud element. We are not persuaded. *Gentry*'s teachings were properly applied by the court. The court's reference to *Bell*'s requirement of an illegal or fraudulent purpose in a contract case does not detract from the correctness of its holding. The district court neither demanded nor considered proof of fraud.

The judgment of the district court is AFFIRMED.