A.G. NELSON and Vida Nelson, Plaintiffs-Appellants,

v.

INTERNATIONAL PAINT COMPANY, INC., Defendant-Appellee.

No. 83–1177.

United States Court of Appeals, Fifth Circuit.

June 25, 1984.

Rehearing and Rehearing En Banc Denied July 26, 1984.

Spivey & Grigg, Paul E. Knisely, Broadus A. Spivey, Austin, Tex., for plaintiffs-appellants.

Clark, Thomas, Winters & Shapiro, Peter E. Ferraro, David Duggins, Barry K. Bishop, Austin, Tex., for defendant-appellee.

Scott, Douglass & Keeton, Austin, Tex., for other interested parties.

Before POLITZ, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

In this Texas diversity case, plaintiffs-appellants Alfred and Vida Nelson appeal from a summary judgment rendered against them in their products liability suit against International Paint Company, Inc., defendant-appellee, a New Jersey corporation. Finding that there is no genuine issue as to any material fact, we affirm the district court's grant of summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Alfred Nelson was injured on June 30, 1978, when he inhaled toxic fumes while painting over a weld at a construction site in Kodiak, Alaska. Nelson alleges that his injury was caused by defectively designed paint.

At the time that he was injured, Nelson was using a marine anti-fouling paint known as "Inter-Trop Red 50." The label on the paint can Nelson was using carried the name "International Paint Company, Inc.," and listed addresses for the company in New York, New Orleans, and San Francisco. Also present on the label was the trademark "International Paint Company."

Shortly after his injury, Nelson returned home to Texas, where he employed Texas counsel to file a products liability action against the manufacturer of the paint. The Texas counsel contacted an Alaska at-

torney, and arranged for him to sue the manufacturer and distributor of the paint in the courts of that state. That attorney left Alaska before the suit was filed, but an associate in his firm brought suit in Alaska state court in April, 1980, naming among the defendants International Paint Company, Inc. ("IPCO"), and International Paint Co. (California), Inc. ("CALCO"), IPCO's wholly-owned subsidiary, which is headquartered in San Francisco. However, because of Nelson's ill-health, and their concern that the new Alaska counsel was inexperienced, the Nelsons directed that a voluntary non-suit be taken in the Alaska court.

The Nelsons then filed suit against IPCO in the court below on May 15, 1980. They sought damages on the basis of strict liability in tort and breach of implied warranty. They contended that the paint was defectively designed and that its label failed to warn adequately of the hazards associated with using Inter-Trop Red 50.

Through IPCO's answer to an interrogatory on June 16, 1981, the Nelsons' Texas counsel learned that Inter-Trop Red 50 was manufactured not by IPCO, but by CALCO.[1] The Nelsons added CALCO as a party-defendant, but CALCO moved to dismiss the complaint against it for lack of personal jurisdiction. The Nelsons opposed the motion, arguing that the court had jurisdiction over CALCO because CALCO was so closely integrated with IPCO that the business conducted in Texas by IPCO could be imputed to CALCO for purposes of jurisdiction. The district court found that IPCO and CALCO were sufficiently separate entities that the Nelsons could not obtain personal jurisdiction over CALCO in Texas. The court then ordered the Nelsons' claim against CALCO transferred to the United States District Court for the Northern District of California. The Nelsons did not appeal that order.

After the Nelsons' action against CALCO was transferred to California, CALCO

moved to dismiss because the statute of limitations had run. The district court there granted the motion, holding that California law applied to the action, and that the state's one-year statute of limitations barred suit against CALCO. The Nelsons appealed, but the Ninth Circuit affirmed. *Nelson v. International Paint Co.,* 716 F.2d 640 (9th Cir.1983).

Meanwhile, in Texas, IPCO moved for summary judgment, contending that it did not design, manufacture, or market the paint that caused Nelson's injuries, and thus that it could not be held liable for Nelson's injuries. The district court granted IPCO's motion for summary judgment, and the Nelsons now appeal.

## II. ISSUES ON APPEAL.

The Nelsons raise several issues on appeal: first, they contend that the evidence shows that there is a genuine issue of fact as to whether IPCO developed the formula; second, they contend that because IPCO's name was on the paint can label, it is liable as the manufacturer under the *Restatement (Second) of Torts* § 400; third, they argue that because the IPCO label caused them to sue IPCO rather than CALCO, IPCO should be estopped from denying liability for CALCO's acts; and, finally, they assert that there is a genuine fact issue whether IPCO can be held liable as the "alter ego" of CALCO. We consider each one of their arguments in turn, mindful that "[w]e must view the evidence in the light most favorable to the opposing party, resolving all reasonable doubts concerning the facts in [its] favor ...." *Miles v. American Telephone & Telegraph Co.,* 703 F.2d 193, 194 (5th Cir.1983).

### A. IPCO's Role in the Design of Inter-Trop Red 50.

As we have previously discussed, CALCO is a wholly owned subsidiary of IPCO. IPCO, in turn, is wholly-owned by International Paint Co. of America, a holding com-

---

**1.** IPCO did, however, manufacture the same product under the name "1609 Supertrop." CALCO's "Inter-Trop Red 50" was marketed

more for the everyday consumer, while IPCO's "1609 Supertrop" was aimed primarily at large commercial and industrial customers.

pany. That company is 100% owned by International Paint Co., Ltd. ("Limited"), a British corporation. Limited has several corporations throughout the world that market marine paints under the trademark "International Paint Company."

In the United States, both IPCO and CALCO manufacture and distribute products under the International Paint Company trademark. IPCO has plants in New Jersey and New Orleans that produce and market paints east of the Rockies, while CALCO's San Francisco plant produces and markets paints west of the Rockies.

■ The Nelsons contend that there is evidence in the record tending to show that IPCO developed the formula that was used in manufacturing Inter-Trop Red 50. Therefore, they argue, IPCO would be liable if the Nelsons proved at trial that the formula was defective.

The Nelsons acknowledge that Jim Drubel, IPCO's vice-president for engineering, testified in his deposition that the formula was developed by Limited, not IPCO. However, the Nelsons assert that Drubel's testimony was contradicted by Jeffry Longmore, CALCO's technical director, who indicated in his deposition that the formula for Inter-Trop Red 50 was developed in IPCO's New Jersey plant. We do not agree. Longmore's testimony was that IPCO manufactured paint using the same formula that was used in Inter-Trop Red 50. Longmore's deposition does not suggest that IPCO developed the formula. Moreover, the Nelsons admitted in response to IPCO's motion for summary judgment that Limited developed the formula.[2]

### B. IPCO's Liability Under the Restatement (Second) of Torts § 400.

■ The Nelsons contend next that, despite the district court's finding to the contrary, there was evidence that IPCO was aware that CALCO was labeling Inter-Trop Red 50 as an IPCO product. They argue that such knowledge is relevant because, under their reading of Texas law, IPCO can be held strictly liable for Nelson's injuries as the manufacturer of Inter-Trop Red 50 if IPCO allowed CALCO to sell Inter-Trop Red 50 under IPCO's name, despite the fact that IPCO did not design, manufacture, or sell the paint. Because we do not believe that, under Texas law, IPCO can be held liable on the ground that the Nelsons assert, it is unnecessary for us to decide whether the Nelsons introduced any evidence indicating that IPCO knew that CALCO was selling Inter-Trop Red 50 as an IPCO product.[3]

The Nelsons assert that if IPCO allowed CALCO to put out Inter-Trop Red 50 as an IPCO product, IPCO faces liability under the *Restatement (Second) of Torts* § 400 (1966), which provides that:

> One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

*Id.* at 337. The rationale underlying this section of the *Restatement* is apparent: For example, if Sears markets a blender as a "Sears" product, it leads consumers to believe that Sears is responsible for and stands behind the product. Accordingly, because Sears has induced such reliance on the part of consumers, Sears will be held liable as the manufacturer of the blender,

2. In their brief opposing IPCO's motion for summary judgment, the Nelsons conceded that Inter-Trop Red 50 "was manufactured from a formula which was developed by International Paint, Ltd....." Record Vol. II at 238.

3. The district court found that IPCO had no knowledge that CALCO was using IPCO's name on Inter-Trop Red 50. The Nelsons contend that Grant Johnson, an IPCO vice-president and the chief operating officer of CALCO, testified that he was aware that CALCO was using IPCO

labels on its products. IPCO asserts that Johnson's deposition testimony cannot be so construed; instead, IPCO contends that Johnson spoke merely of the fact that he was aware that the two companies used the same artwork to save costs. IPCO also points out that the label for Inter-Trop Red 50 registered with the Environmental Protection Agency read "International Paint Co. [California] Inc.," and that it had no knowledge that CALCO was using an unregistered label.

even if it entrusted another company with the responsibility for manufacturing a safe and reliable blender that Sears will sell as its own.[4]

For instance, in *S. Blickman, Inc. v. Chilton,* 114 S.W.2d 646 (Tex.Civ.App.— Austin 1938, no writ), the plaintiff fell off a defective bar stool in a hotel fountain area. The plaintiff sued the contractor who was remodeling the hotel at the time, and who had furnished the bar stool that caused the plaintiff's injuries. The contractor denied that he had manufactured the bar stool. However, because the contractor had sold the stool with the contractor's name on it, the court held that, under section 400, the contractor was liable as if it were the manufacturer, whether or not it had in fact manufactured the defective stool that caused the plaintiff's injuries. 114 S.W.2d at 649.

Similarly, in *Ford Motor Co. v. Mathis,* 322 F.2d 267 (5th Cir.1963), the plaintiff sued Ford when his car headlights failed and caused him grave injury. Although Ford assembled the plaintiff's car and had sold it under the Ford name, it denied that it was the manufacturer of the defective part. Nonetheless, we held that because the Texas courts had expressly adopted section 400 in *Blickman,* Ford was liable because the dimmer switch that caused the headlights to fail was a part of the product

Ford had sold under its own name. 322 F.2d at 272–74.

In both of these cases, the defendant was held liable because it distributed another's defective product under its own name. Here, however, we are presented with a situation where a distributor has marketed a product not under its name, but another's. Nevertheless, the Nelsons contend that if IPCO allowed CALCO to put out Inter-Trop Red 50 under IPCO's name, IPCO should be vicariously liable under section 400, despite the fact that IPCO did not manufacture or market the can of paint that injured Nelson.

The Texas courts have expressly rejected this interpretation of section 400. In *Stanford v. Dairy Queen Products of Texas,* 623 S.W.2d 797 (Tex.App.—Austin 1981, writ ref'd n.r.e.), the plaintiffs, a husband and wife, alleged that the wife became ill after eating an "unwholesome" cheeseburger sold at a Dairy Queen restaurant in Burnet County, Texas. They brought suit against three defendants, one of whom was Dairy Queen Products of Texas, a partnership.[5] Dairy Queen Products possessed exclusive authority in Texas over the use of the registered trade name "Dairy Queen." Its business consisted of authorizing others to use the "Dairy Queen" name in the operation of restaurants throughout the

**4.** The *Restatement (Second) of Torts* § 400 comment d explains that:

The rule stated in this Section applies only where the actor puts out the chattel as his own product. The actor puts out a chattel as his own product in two types of cases. The first is where the actor appears to be the manufacturer of the chattel. The second is where the chattel appears to have been made particularly for the actor. In the first type of case the actor frequently causes the chattel to be used in reliance upon his care in making it; in the second, he frequently causes the chattel to be used in reliance upon a belief that he has required it to be made properly for him and that the actor's reputation is an assurance to the user of the quality of the product. On the other hand, where it is clear that the actor's only connection with the chattel is that of a distributor of it (for example, as a wholesale or retail seller), he does not put it out as his own product and the rule stated in this section is inapplicable. Thus, one puts out a

chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark. When such identification is referred to on the label as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the person so identified....

**5.** The other two defendants named were the owner of the land and the building housing the Dairy Queen restaurant, and the lessee of the property who owned and operated the restaurant. 623 S.W.2d at 799 n. 1. The plaintiffs alleged that the defendants (1) breached a warranty of fitness of consumer goods manufactured by the defendants; (2) were strictly liable for selling defective food; (3) negligently dispensed tainted food; and (4) were liable under Tex.Bus. & Com.Code Ann. §§ 17.46 & 17.50 (Vernon Supp. 1983) (deceptive trade practices). 623 S.W.2d at 799 n. 1.

state, including the one where the wife suffered injury. The partnership also had the responsibility for maintaining the value of the "Dairy Queen" trade name by, *inter alia,* conducting periodic inspections of the restaurants and conducting advertising campaigns.

The plaintiffs brought suit against Dairy Queen Products and the other two defendants in Travis County, where the plaintiffs resided. Because Dairy Queen Products' principal place of business was in Bexar County, it interposed a plea of privilege because the general venue rule in Texas at that time provided that Texas residents could be sued only in the county of their domicile. *See* Tex.Rev.Civ.Stat.Ann. art. 1995 (Vernon 1964 & Supp.1982) (repealed); 623 S.W.2d at 798–99. Although the plaintiffs opposed a transfer of venue, the trial court sustained Dairy Queen Products' plea.

On appeal, the plaintiffs argued that some of the enumerated exceptions to the general venue rule allowed them to sue Dairy Queen Products outside of Bexar County. One such exception that the plaintiffs relied on was that Dairy Queen Products could be sued in Travis County if it was the manufacturer of the product that caused the wife's injuries.[6] The plaintiffs argued that because Dairy Queen Products allowed the restaurant owner to use the Dairy Queen name on the restaurant's products, Dairy Queen could be held liable as the manufacturer of those products un-

der the *Restatement (Second) of Torts* § 400. 623 S.W.2d at 797. The court disagreed:

The record establishes as a matter of law that a restaurant employee in the Burnet, Texas "Dairy Queen" was the literal "manufacturer" of the sandwich in the sense of actually assembling the various ingredients of the sandwich, processing them and preparing the sandwich from its various ingredients. Moreover, appellee was not the actual "vendor" of the sandwich to which § 400 of the Restatement imputes the actual manufacturer's liability. In this case, the Burnet, Texas restaurant employee or employees were the literal manufacturer and the literal vendor. Reliance upon the Restatement is therefore misplaced.

623 S.W.2d at 805.

More significantly, in *Better Beverages, Inc. v. Meschwitz,* 643 S.W.2d 502 (Tex. App.—Houston [14th Dist.] 1982, no writ), the plaintiff sought to hold the Dr. Pepper Company liable for injuries she suffered when the top of a Dr. Pepper bottle flew off and hit her in the eye. The plaintiff brought suit against Dr. Pepper in Washington County, Texas, the county in which the cause of action arose. Dr. Pepper filed a plea of privilege, requesting that the suit be transferred to another county.[7]

The plaintiff opposed Dr. Pepper's plea, and sought to establish venue on the basis of subdivisions 9a[8] and 31[9] of Tex.Rev.Civ.

---

**6.** At that time, Tex.Rev.Civ.Stat.Ann. art. 1995, § 31 (Vernon 1964 & Supp.1982) (repealed), provided:

Breach of warranty by a manufacturer.— Suits for breach of warranty by a manufacturer of consumer goods may be brought in any county where the cause of action or a part thereof accrued, or in any county where such manufacturer may have an agency or representative, or in the county in which the principal office of such company may be situated, or in the county where the plaintiff or plaintiffs resides.

Subdivision 31 has subsequently been recodified at Tex.Rev.Civ.Stat.Ann. art. 1995, § 3(c) (Vernon Supp.1983).

**7.** Suit was also brought against Better Beverages, Inc., the bottler and distributor of Dr. Pepper in Washington County.

**8.** Subdivision 9a of Tex.Rev.Civ.Stat.Ann. art. 1995 (Vernon 1964 & Supp.1982) (repealed) provided that:

9a Negligence.—A suit based upon negligence per se, negligence at common law or any form of negligence, active or passive, may be brought in the county where the act or omission of negligence occurred or in the county where the defendant has his domicile. The venue facts necessary for plaintiff to establish by the preponderance of the evidence to sustain venue in a county other than the county of defendant's residence are:

1. That an act or omission of negligence occurred in the county where suit was filed.

2. That such act or omission was that of the defendant, in person, or that of his servant, agent or representative acting within the scope of his employment.

3. That such negligence was a proximate cause of plaintiff's injuries.

**9.** *See supra* note 6.

Stat.Ann. art. 1995. Although the trial court overruled Dr. Pepper's plea of privilege, on appeal the Texas Court of Appeals held that Dr. Pepper's plea should have been sustained. The court held that in order for the plaintiff to establish venue under subdivision 9a, the plaintiff "must prove a cause of action against appellant, Dr. Pepper Company. In a venue hearing, the plaintiff's burden is the same as for a trial on the merits; a prima facie case is not enough." 643 S.W.2d at 504 (citations omitted).

Dr. Pepper contended that no cause of action could be asserted against it for the plaintiff's injuries because, despite the fact that its trademark was carried on the bottle's label, Dr. Pepper was not involved in the processing, bottling or capping of the bottle that caused the plaintiff's injuries. Dr. Pepper furnished the manufacturer the syrup used in preparing the carbonated drink, but there was no allegation that the syrup had caused the bottle top to fly off.

The court held that no negligence action could lie against Dr. Pepper because it had not participated in the manufacturing process, and thus the plaintiff was unable to establish venue under subdivision 9a. 643 S.W.2d at 504. The plaintiff also advanced the same argument that was made in *Dairy Queen Products,* alleging that Dr. Pepper was the manufacturer for purposes of subdivision 31 because its trademark was carried on the bottle. The *Better Beverages* court likewise rejected that application of section 400 of the *Restatement* because it was undisputed that Better Beverages, Inc., Dr. Pepper's co-defendant, was the manufacturer of the product. 643 S.W.2d at 504.

Thus, even if the Nelsons could show at trial that IPCO knew that CALCO was distributing Inter-Trop Red 50 under the IPCO label, the Texas courts have made it clear that no cause of action can lie against IPCO as the "manufacturer" under section 400 of the Restatement.[10]

---

10. The Nelsons argue that their position is supported by *Maintenance and Equipment Manufacturers v. John Deere Co.,* 554 S.W.2d 28 (Tex. Civ.App.—Houston [14th Dist.] 1977, writ dism'd), another plea of privilege case under former Tex.Rev.Civ.Stat.Ann. art. 1995, § 31 (Vernon 1964 & Supp.1982) (repealed). There, the plaintiff alleged that while he was operating a John Deere tractor, the tractor overturned, causing him serious injury. The plaintiff contended that the accident could have been prevented had the tractor been equipped with front-wheel brakes. The plaintiff sued, among others, John Deere Co. on the theories of negligence and strict liability in tort for defective design. John Deere moved for change of venue, which was granted by the trial court.

On appeal, the plaintiff argued that John Deere could be sued in the county where suit was brought because John Deere was the "manufacturer" of the tractor for purposes of article 1995, § 31. The only proof that John Deere manufactured the tractor was that "John Deere" plates were on the tractor and that the tractor was purchased from a John Deere dealer. There, the court held that "[t]he unrebutted evidence that the defendant's name, 'John Deere,' was on the tractor coupled with the testimony that the tractor was bought from a John Deere dealer is sufficient to raise the presumption that [John Deere] was the manufacturer," and cited the *Restatement (Second) of Torts* § 400 in sup-

port of its holding. Here, there was undisputed evidence that CALCO was the manufacturer of Inter-Trop Red 50, defeating the presumption that IPCO was the manufacturer. Moreover, there was no allegation that the paint in question was purchased from an IPCO store or dealership. The plaintiffs in *Stanford v. Dairy Queen Products, supra,* advanced the same argument that is being made here, to which that court responded: "If [plaintiffs] intend a vicarious liability founded upon the mere fact that the sandwich was sold under the "Dairy Queen" sign, making [Dairy Queen Products] liable in a larger but essentially abstract definition of 'manufacturer,' that theory was rebutted ... by ... evidence showing that an employee of the operator actually prepared the sandwich." 623 S.W.2d at 806. *See also Better Beverages, Inc. v. Meschwitz, supra,* at 504; *John Deere Industrial Equipment Co. v. McMahon Construction Co.,* 608 S.W.2d 318, 320 (Tex.Civ.App.—Beaumont 1980, writ dism'd); *John Deere Co. v. Whitley,* 597 S.W.2d 43, 46 (Tex.Civ.App.—Amarillo 1980, writ dism'd).

The Nelsons also rely on *E.I. du Pont de Nemours and Co. v. McCain,* 414 F.2d 369 (5th Cir.1969). In *McCain,* the plaintiffs brought suit for injuries suffered when a water repellent compound, called "X–33," exploded. The compound was manufactured by Wilmington Chemical Corporation ("WCC"), and contained 98% Shell Sol B, a petroleum distillate supplied by

## C. Estoppel.

The Nelsons contend also that if IPCO knew that CALCO was using IPCO labels, IPCO should be estopped from denying liability because the mislabeling caused the Nelsons to sue the wrong party. The Nelsons contend that because the label of the paint that allegedly caused Nelson's injuries carried IPCO's name, they brought suit in Texas only against IPCO, and that by the time they discovered that CALCO was the manufacturer of the paint, the statute of limitations had run against CALCO. Thus, they argue that IPCO should face liability for CALCO's acts.

■ Again, we do not believe that whether IPCO knew that CALCO was using IPCO's name is material here because the Nelsons failed to adduce any evidence that they detrimentally relied on the fact that IPCO's name was the only one on the label. Although the label did not carry CALCO's name, it listed CALCO's San Francisco address. The Nelsons' original lawsuit named CALCO as a defendant and alleged that CALCO manufactured and distributed Inter-Trop Red 50. Presumably the Nelsons' Alaska counsel discovered that CALCO manufactured Inter-Trop Red

50 from the fact that CALCO's address was on the label of the paint can in question. That the Nelsons named CALCO in their original complaint demonstrates that they did not detrimentally rely on the fact that only IPCO's name was on the label.

Because the Nelsons dismissed the suit before either IPCO or CALCO could answer, neither party misled the Nelsons as to who manufactured the paint that caused Nelson's injuries. However, the Nelsons were aware that CALCO existed and may have manufactured Inter-Trop Red 50, and the failure of Texas counsel to name CALCO as a defendant in the Texas suit cannot redound in the Nelsons' favor. Moreover, once the present action was brought, discovery was had and IPCO never misrepresented to the Nelsons or their attorney that it was the manufacturer of Inter-Trop Red 50.

## D. CALCO as the Alter Ego of IPCO.

■ Finally, the Nelsons assert that CALCO was simply an agent or conduit through which IPCO did its business, so that whether they sued IPCO or CALCO, both are, in essence, the same. However,

Shell Oil Company, and 2% "Tyzor HS," an organic titanate supplied by duPont. Suit was brought against WCC, Shell and duPont on the grounds of negligence and strict liability in tort.

DuPont helped WCC develop X–33 by advising WCC on the proper mix of Sol B and Tyzor HS, and by conducting tests on X–33 in the duPont labs. DuPont reserved the right to approve the product label, which prominently displayed the duPont trademark, and duPont also approved the advertising material that claimed X–33 "was produced 'in strict accordance with duPont's exacting quality control standards.'" 414 F.2d at 371.

In that case, the jury found that the label for X–33 was printed so as to lead the public to believe that the product was duPont's, yet duPont had negligently failed to test X–33's safety, or determine whether the warnings on the label were adequate. We found that duPont had such a responsibility because "[i]t counseled and advised [WCC] concerning the proper formula to be used in the compound; it contacted Shell, which recommended to [WCC] the use of the highly flammable Shell Sol B [and] it conducted quality control tests on X–33." Id. at 373.

In the present case, we have already determined that IPCO had no role in developing or

designing Inter-Trop Red 50. Moreover, the Nelsons proceed against IPCO on the grounds of strict liability and breach of warranty, not negligence. However, the plaintiffs in McCain also maintained that duPont should be held strictly liable for their injuries on the strength of the Restatement (Second) of Torts § 400. The plaintiffs argued that although Tyzor HS was a harmless component of the compound, duPont should be held liable as the manufacturer of the water repellant because duPont had allowed the product to be sold under the duPont trademark. Id. at 372 n. 1. Because we held that the jury's verdict could be sustained on the ground of negligence alone, we expressly declined to consider whether section 400 was applicable in that instance.

Finally, the Nelsons cite Connelly v. Uniroyal, Inc., 389 N.E.2d 155 (Ill.1979), cert. denied sub nom. Uniroyal Englebert Belgique v. Connelly, 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980), and City of Hartford v. Associated Construction Co., 34 Conn.Super. 204, 384 A.2d 390 (1978), both of which support their interpretation of section 400 as they would have us apply it in the present case, but neither of which is Texas authority, which we are bound to apply.

we find that the material facts with regard to this issue are undisputed, and that there is no basis for regarding CALCO as the alter ego of IPCO.

As a threshold matter, the Nelsons contend that the question whether a subsidiary is the alter ego of its parent is, in all cases, one for the jury. We disagree. Our past decisions make clear that, in the lack of sufficient evidence to place the alter ego issue in dispute, a corporate defendant may be entitled to summary judgment. *See, e.g., Miles v. American Telephone & Telegraph Co.,* 703 F.2d at 194; *Walker v. Newgent,* 583 F.2d 163, 165 (5th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979).

Under Texas law, the question whether a parent corporation can be held responsible for a subsidiary's acts rests in large part on whether the plaintiff seeks to hold the parent liable for a tort or contract claim. *See Edwards Co. v. Monogram Industries, Inc.,* 730 F.2d 977, 980–82 (5th Cir.1984) (en banc). In a tort case, such as this, the Texas courts have been willing to hold a parent liable for a subsidiary's acts where the parent has so dominated the subsidiary that the subsidiary is found to be a mere agent or conduit through which the parent conducts its business. *See, e.g., Gentry v. Credit Plan Corp.,* 528 S.W.2d 571, 573 (Tex.1975); *Moffett v. Goodyear Tire & Rubber Co.,* 652 S.W.2d 609, 613 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Allright Texas, Inc. v. Simons,* 501 S.W.2d 145, 149–50 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Western Rock Co. v. Davis,* 432 S.W.2d 555, 558 (Tex.Civ.App.—Fort Worth 1968, no writ). Of particular significance in most tort cases is whether the subsidiary is undercapitalized, because tort claimants usually have not voluntarily dealt with the subsidiary, and the question is whether a parent should be able to transfer a risk of loss or injury to members of the general public in the name of a subsidiary that may be marginally financed. As the Texas Supreme Court noted in *Gentry v. Credit Plan Corp., supra,* at 573:

Unlike a suit for breach of contract, the plaintiff in a tort case does not have the burden of justifying a recovery against the parent when he willingly contracted with the subsidiary. The problem in such a case is essentially one of allocating the loss. It is not necessary to establish fraud, and the financial strength or weakness of the subsidiary is an important consideration.

*See also Cupples Coiled Pipe, Inc. v. Esco Supply Co.,* 591 S.W.2d 615, 618 (Tex.Civ. App.—El Paso 1979, writ ref'd n.r.e.) (quoting *Gentry* ); *Western Rock Co. v. Davis, supra,* at 558; Hamilton, *The Corporate Entity,* 49 Tex.L.Rev. 979, 984–85 (1971).

Such a consideration is not at issue here. The present suit lies against the parent itself, not its subsidiary. Furthermore, the Nelsons do not even suggest that CALCO, or even IPCO for that matter, is undercapitalized. Nor is there any evidence in the record to that effect. Nonetheless, the Nelsons assert that CALCO was operated merely as an agent of IPCO, and that IPCO is therefore liable for CALCO's acts.

For example, the Nelsons assert that CALCO should be regarded as IPCO's alter ego because some of CALCO's directors sit on IPCO's board. Also relevant, they contend, is that IPCO owns 100% of CALCO's stock. Yet in *Gentry, supra,* the Texas Supreme Court held that a "subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." 528 S.W.2d at 573. *See also Edwards Co. v. Monogram Industries, Inc., supra,* at 985–86; 15 Tex.Jur.3d § 14, at 164 (1984).

The factors relevant to determining whether a subsidiary will be held to be the alter ego of its parent, and thus impute liability to the parent, were recently discussed in *Moffett v. Goodyear Tire & Rubber Co., supra,* a case similar to the instant one. In *Moffett,* the plaintiffs were injured when a tire on the pickup truck in which they were traveling blew out and caused

the truck to turn over. Although the tire carried the "Goodyear" trademark, it was not manufactured by Goodyear, but rather by its wholly-owned French subsidiary. Although Goodyear denied that it had designed, manufactured, or sold the tire, the plaintiffs sought to hold Goodyear liable on the ground that its French subsidiary was merely a conduit through which Goodyear carried on its business of manufacturing and selling tires under the Goodyear trademark.

The court listed the following factors as relevant to determining whether a subsidiary is a mere agent of the parent:

> [W]hether the two file consolidated income tax returns; whether operating capital is financed by the parent or borrowed from other sources; the extent to which separate books and accounts are kept; whether they both have common departments of businesses; whether they have separate meetings of shareholders and directors; [and] whether the officer or director of the one corporation is permitted to determine the policies of the other . . . .

652 S.W.2d at 609 (citing *Gentry, supra;* Douglas & Shanks, *Insulation for Liability Through Subsidiary Corporations,* 39 Yale L.J. 193 (1929)). In *Moffett,* the jury found that Goodyear's French subsidiary was not Goodyear's alter ego, and the jury's finding was upheld on appeal.

In the present case, the material facts are not in dispute. IPCO and CALCO do not file consolidated income tax returns. IPCO does not provide CALCO's operating capital, and CALCO has never borrowed money from IPCO (or anyone else, for that matter). CALCO keeps its financial records separate from those of IPCO's, and each corporation has its own account managers, treasurers and controllers. Each maintains its own headquarters. They have separate Board of Directors meetings. There are no mutual employees and they share no ownership of property. They each have their own distribution systems and sales force, and they each manage and maintain their own factories, as well as secure their own raw materials. Nor do IPCO and CALCO have the same operating officers. Although Grant Johnson, CALCO's chief operating officer, is an executive vice-president of IPCO, Johnson's position with IPCO appears to be in title only, since IPCO has never employed or paid Johnson, and Johnson is not involved in the operations of IPCO.

The Nelsons note that CALCO does not maintain its own research and development facilities, but rather uses IPCO's. However, CALCO pays IPCO for the research and development information it receives, just as it would pay any other company for that service. Similarly, although IPCO and CALCO jointly advertise some of their products, each corporation pays its proportionate share of costs. Although both IPCO and CALCO sell products under the "International Paint Company" trademark, the two are operated as separate companies and are represented as such.

In sum, the Nelsons have satisfied none of the criteria found to be indicative of an agency relationship between the parent and the subsidiary. The evidence makes clear that IPCO and CALCO are distinct entities, and that the district court correctly granted IPCO summary judgment on this issue.

## III. CONCLUSION.

We are aware that on many occasions we have held that use of summary judgment is rarely appropriate in products liability cases. *See, e.g., Davidson v. Stanadyne,* 718 F.2d 1334, 1338 (5th Cir.1983). *See also* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2729, at 195 (1978). This is because in a products liability case, the trier of fact "is called upon to decide whether a product's design is 'unreasonably dangerous' in light of several factors," *Davidson v. Stanadyne, supra,* at 1339, and " 'whether a product was defectively designed requires a balancing by the jury of its utility against the likelihood of and gravity of injury from its use.' " *Id.* (quoting *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 745–76 (Tex.1980)). However, we noted in *Davidson* that "[i]n

tort actions in which determinations of a less 'elusive nature,' such as the existence of an agency relationship ... are dispositive, summary judgment may more often be appropriate." 718 F.2d at 1339 n. 8. *See also* 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2729, at 197. Similarly, summary judgment is often appropriate when the plaintiff has named the wrong party as the defendant. *Id.* at 200.

In many respects, this case is not unlike *Walker v. Newgent, supra.* In *Walker,* the plaintiff suffered injuries while traveling in an automobile manufactured by General Motors' wholly-owned German subsidiary. He sued both General Motors and its subsidiary on the basis of negligence, strict liability in tort for the defective design and manufacture of the car's windshield, and breach of express and implied warranties. The district court dismissed the suit against the subsidiary for lack of personal jurisdiction. *See Walker v. Newgent,* 442 F.Supp. 38 (S.D.Tex.1977). Subsequently, General Motors moved for summary judgment because it did not design, manufacture, or sell the automobile in question, and because there was no basis for disregarding the separate existence of General Motors' subsidiary. 583 F.2d at 165. The district court granted General Motors summary judgment, and we affirmed. *Id.* at 168.

Likewise, IPCO did not design, manufacture, or sell the can of paint that allegedly caused Nelson's injuries. Nor does the evidence that the Nelsons have put forth provide any basis for holding CALCO as IPCO's alter ego. Accordingly, the judgment of the district court is AFFIRMED.