**HARWOOD TIRE—ARLINGTON, INC. and Harwood Tire, Inc., Appellants.**

v.

**Faron YOUNG, Appellee.**

**No. 2–96–343–CV.**

Court of Appeals of Texas, Fort Worth.

Feb. 19, 1998.

---

Watson, Kerr, & Parker, P.C., Elizabeth Sturdivant Kerr, Fort Worth, for Appellant.

Law Offices of John David Hart, John David Hart, Fort Worth, for Appellee.

Before DAY, DAUPHINOT and RICHARDS, JJ.

## OPINION

DAUPHINOT, Justice.

This is a negligence case arising from an on-the-job injury. Faron Young sued his employer and its parent company, both nonsubscribers to worker's compensation insurance. The jury found both corporations liable and awarded Young $1.3 million in damages. Appellants challenge the legal and factual sufficiency of the jury's negligence and alter ego findings. Appellants also assert that they were unfairly prejudiced by the exclusion of evidence of other insurance in lieu of worker's compensation insurance. Lastly, Appellants claim that the lawsuit against the parent company was barred by the statute of limitations.

We affirm.

## DISREGARDING THE CORPORATE FICTION

Young's original employer, Harwood Tire, Inc. ("HTI"), reorganized approximately thirty days before Young was injured. The reorganization consisted of creating four subsidiary corporations including Harwood Arlington, Inc., purportedly Young's new employer after the reorganization. Young sued both Harwood Arlington, Inc. and its parent, HTI, claiming that Harwood Arlington, Inc. was HTI's alter ego. The jury found in Young's favor on the alter ego issue. Appellants challenge both the legal and factual sufficiency of the evidence to support the jury's alter ego finding.

In determining a "no-evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Leitch*, 935 S.W.2d at 118.

A "no-evidence" point may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the

existence of the vital fact. *See Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

■ An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 29 (Tex.1993).

■ The owner of a corporation is generally not liable for the corporation's debts. Under the doctrine of limited liability, creditors have recourse only against the corporation itself, not against its parent company or shareholders. However, when the corporate privilege is abused, courts will disregard the corporate fiction and hold the parent company or shareholders liable. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986); *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex.1975). "We disregard the corporate fiction ... when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry*, 721 S.W.2d at 271.

■ Alter ego is one of several bases for disregarding the corporate fiction. *See id.* at 272. Alter ego comes into play "where a corporation is organized and operated as a mere tool or business conduit of another corporation." *See id.* Alter ego applies when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased and holding only the subsidiary corporation liable would result in injustice. *See id.* It is shown from the total dealings of the parent corporation and its subsidiary. *See id.; Gentry*, 528 S.W.2d at 573–76. Inadequate capitalization is another basis for disregarding the corporate fiction. *See Castleberry*, 721 S.W.2d at 271 n. 3; *Torregrossa v. Szelc*, 603 S.W.2d 803, 804–05 (Tex.1980). Young's jury question on the issue of disregarding the corporate fiction encompassed both the alter ego and inadequate capitalization theories.

■ The determination of whether the corporate fiction should be disregarded is a fact question for the jury. *See Castleberry*, 721 S.W.2d at 271. It is a fact-specific determination made on a case-by-case basis. *See id.* at 273.

■ When Faron Young went to work for HTI, it owned three unincorporated tire stores in Arlington, Bedford, and Irving. Young was the service manager of the Arlington store at the time he was injured.

HTI reorganized in June of 1992 by creating four subsidiary corporations—Harwood Arlington, Inc., Harwood Bedford, Inc., Harwood Irving, Inc., and Harwood CSF, Inc. HTI remained the parent corporation and retained 100% ownership of the stock in all four subsidiaries. Before the reorganization, Frank Roszell owned 100% of HTI's stock and was its sole director. After the reorganization, Roszell owned 100% of HTI's stock and was the sole director of all subsidiaries.

Roszell was not an officer of Harwood Arlington, Inc. Roszell's wife and Robert Yantis were officers of Harwood Arlington, Inc. and also officers of some of the other subsidiary corporations. Roszell's motivation for the reorganization was to have HTI grow and prosper. He believed this could best be done by incorporating each store. Limiting the liability of HTI and its subsidiaries played a small part in Roszell's decision to reorganize HTI.

Each subsidiary had its own by-laws and articles of incorporation and obtained its own federal tax-identification number. A consolidated tax return was prepared for HTI and all subsidiaries; however, each subsidiary filed its own franchise tax reports. The corporate records were maintained "exceptionally well," and there was no commingling of funds. Corporate formalities were observed, and intercorporate transfers were documented.

Before the reorganization, HTI had assets of $1,174,734 and retained earnings of $390,966. As part of the reorganization, Roszell decided how assets would be allocated among the subsidiaries. Harwood Arlington, Inc. was allocated $154,000 in assets and $98,000 in retained earnings. Roszell testified that

HTI was more capable of paying a judgment before the reorganization than Harwood Arlington, Inc. was after the corporate restructuring.

After the reorganization, Roszell was given blanket approval in managing all of the subsidiaries. The newly-formed subsidiaries continued to do business exactly as they did before. Neither the signs on the stores nor the employee's uniforms changed. Before the reorganization, HTI employed all of the workers at the Arlington, Bedford, and Irving tire stores. The employees did not complete new applications after the reorganization. If a subsidiary store was understaffed, Roszell gave "permission" to hire more employees.

Vandolyn Lambert, Roszell's C.P.A., did work specifically for Harwood Arlington, Inc. after the reorganization. She was paid by HTI, not Harwood Arlington, Inc. HTI paid for Roszell's personal income tax return to be prepared. Roszell did not pay for it and did not report it as income.

Assets of the subsidiaries were exchanged between the companies through intercompany transfers. When Harwood Arlington, Inc. was closed, some equipment and employees were transferred from the Arlington store to other subsidiaries. Roszell testified that he did not know if the other subsidiaries paid for the equipment received from Harwood Arlington, Inc.

In 1992, Harwood Arlington, Inc. paid $50,000 of Roszell's $102,000 salary. Even though Harwood Arlington, Inc. was characterized as "barely breaking even" at the end of 1993, it paid Roszell a $47,000 management fee shortly before it closed in December. Harwood Arlington, Inc. owed no debts at the time it closed. It closed with $36,000 in assets.

The term "HTI" was used synonymously for all the stores after the reorganization. Since its inception and before reorganization, HTI held itself out to the public as "HTI Arlington." It continued to do business as "HTI Arlington" after reorganization through the time of trial. The paychecks of the Arlington store's employees were drawn on an account denominated "HTI Arlington"

both before and after the reorganization. After the reorganization, HTI provided each store with a generic safety manual prepared by Roszell bearing the corporate "HTI" logo.

The location at which the Arlington store did business was actually owned by Goodyear. Harwood Arlington, Inc. never signed a lease with Goodyear after the reorganization. Instead, the lessee on the lease both before and after the reorganization was HTI. After the reorganization, Harwood Arlington, Inc. never signed a lease with HTI. The letter notifying Goodyear of the termination of the lease on the Arlington store was written by Roszell and signed "Harwood Tire, Inc. d/b/a Harwood Arlington."

As part of the reorganization, HTI transferred all real estate formerly owned by HTI to Harwood CSF, Inc. This real estate consisted of the real property on which the Harwood Irving store was located. It was encumbered by a $400,000 mortgage. Each month, Harwood Arlington, Inc. paid what Roszell characterized as "rent" to Harwood CSF, Inc. Harwood Arlington, Inc. had no employees in Irving; however, a bookkeeper worked out of the Irving location who did limited work for all of the subsidiaries. The monthly funds paid by Harwood Arlington, Inc. to Harwood CSF, Inc. were used to pay off the Irving real estate owned by Harwood CSF, Inc., but Harwood Arlington, Inc. received no ownership interest in the Irving real estate. When asked why one subsidiary would pay off another subsidiary's debt without receiving any benefit, Roszell answered "I don't know."

This evidence shows that Harwood Arlington, Inc. was operated as a mere tool of HTI and that there was no separateness between the two. The evidence was both legally and factually sufficient to support the jury's findings disregarding the corporate fiction and holding HTI liable for the injuries of its subsidiary corporation's employee. We overrule points one and two.

## EVIDENCE OF OTHER INSURANCE

The trial court admitted evidence that HTI and Harwood Arlington, Inc. dropped their worker's compensation insurance at the time of reorganization; however, it excluded evi-

dence that this insurance was replaced with other health and disability insurance. Appellants admit that they waived any complaints about the admission of evidence concerning their dropping of the worker's compensation insurance because they failed to object to the admission of such evidence during the trial. *See* TEX.R.APP. P. 33.1(a). Furthermore, it was appellants who first admitted evidence of their nonsubscriber status and appellants' counsel asked questions in both direct and cross-examination eliciting testimony that appellants had dropped their worker's compensation coverage. *See McInnes v. Yamaha Motor Corp., USA,* 673 S.W.2d 185, 188 (Tex. 1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985) (holding a party on appeal may not complain of the admission of evidence offered by the other side when that party introduced the same evidence or evidence of a similar character.) Nevertheless, appellants argue that they were unduly prejudiced by the exclusion of evidence of other insurance and that the jury could not properly evaluate the alter ego claim without the excluded evidence.

■■■■ To obtain reversal of a judgment based upon the admission or exclusion of evidence, appellants must show that the trial court did in fact commit error by excluding the evidence, and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP. P. 44.1(a). To demonstrate harmful error, appellants must show that the whole case turned on the exclusion of the evidence. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995); *Macias v. Ramos,* 917 S.W.2d 371, 374 (Tex.App.—San Antonio 1996, no writ). We must review the entire record to determine whether the whole case turned on the excluded evidence. *See Gee,* 765 S.W.2d at 396.

■■■ The law in Texas is well-settled that evidence regarding the receipt by a plaintiff of collateral benefits, such as insurance proceeds, is inadmissible. *See Myers v. Thomas,* 143 Tex. 502, 186 S.W.2d 811, 813 (1945); *Kendrix v. Southern Pac. Transp. Co.,* 907 S.W.2d 111, 112 (Tex.App.—Beaumont 1995,

writ denied). Evidence that a plaintiff received insurance payments "is irrelevant and immaterial, and is calculated to work injury." *Myers v. Thomas,* 186 S.W.2d at 813. Further, admission of collateral benefits evidence poses the risk that a jury will view a plaintiff's recovery as a double recovery and adjust their verdict accordingly. *See Macias,* 917 S.W.2d at 374.

Appellants' complaints regarding the exclusion of evidence of other insurance fall into two categories. Appellants complain that they were portrayed as heartless employers who did not care enough to provide their employees with insurance. Appellants also argue that evidence of other insurance was essential to evaluate the undercapitalization theory asserted by Young to pierce the corporate veil.

■■■ First, appellants claim that without the excluded evidence they were helpless to counter any negative inferences to be drawn from the fact that they had dropped worker's compensation insurance. Yet it was appellants who opened the door to the admission of evidence concerning their nonsubscriber status. This did not, however, render evidence of other insurance admissible in contravention of the collateral-source rule. Furthermore, appellants failed to object to the admission of evidence regarding their nonsubscriber status and offered such testimony themselves; therefore, they cannot now complain of the inferences that could have been drawn from that evidence. Moreover, the evidence of appellants' nonsubscriber status was not so pervasive as to deny appellants a fair trial. *See Irvan v. Frozen Food Express,* 780 F.2d 1228, 1231 (5th Cir.1986).

■■■ Second, appellants claim that the excluded evidence was essential to defend Young's claim of Harwood Arlington, Inc.'s undercapitalization. Yet appellants have failed to explain how the evidence of other insurance would show adequate capitalization or require a different result. The evidence shows that neither the entire case nor, as appellants argue, the alter ego issue turned on the exclusion of evidence of other insurance.

Under the circumstances of this case, the trial court did not err in excluding evidence of other insurance. We overrule point three.

### STATUTE OF LIMITATIONS

HTI asserts that it established its statute of limitations defense; therefore, it complains that the jury's finding that Young used due diligence to serve HTI with citation of process was supported by legally and factually insufficient evidence. HTI concedes that these points are immaterial if we affirm the jury's alter ego finding.

Young was injured on June 30, 1992. Young sued HTI on June 11, 1993, and HTI answered on July 23, 1993. Young sued Harwood Arlington, Inc. on September 1, 1993, and Harwood Arlington, Inc. answered on April 12, 1994. On June 6, 1994, approximately three weeks before the statute of limitations would have run on Young's claim, he nonsuited HTI. He again sued HTI on June 29, 1994, but citation did not issue until January 20, 1997, almost seven months later.

■ The statute of limitations is tolled as to a defendant if that party's alter ego has previously been timely sued and served with citation of process. *See Matthews Constr. Co., Inc. v. Rosen,* 796 S.W.2d 692, 693 (Tex. 1990); *Gentry,* 528 S.W.2d at 575. In other words, two parties in an alter ego relationship are regarded as identical for the purposes of determining whether a suit is barred by limitations. *See id.* It is undisputed that Harwood Arlington, Inc. was timely sued and served with citation of process. Because HTI was Harwood Arlington, Inc.'s alter ego, it was also timely sued and served with citation of process. We overrule points four and five.

### NEGLIGENCE

Appellants' remaining points challenge the legal and factual sufficiency of the evidence to support the jury's negligence finding. The sufficiency of the evidence standards of review have previously been set forth in this opinion.

■ To establish negligence, one must show the existence of a legal duty owed by one person to another, a breach of that duty, and damages proximately resulting from the breach. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987).

■ Young was injured while repairing a van suspended overhead on a hydraulic lift. The lift's front arms slipped from under the van dropping the weight of the van directly on Young's head. The pads on the lift were "very worn."

Young did not place the van on the lift the day he was injured. Another Harwood Arlington, Inc. employee, Ricky Jewell, drove the van onto the lift, elevated the lift, and started repairing the van's air conditioner before leaving for a doctor's appointment. Young agreed to help Jewell by finishing the job. When Young first approached the van on the day of the accident, it did not appear to be unstable on the lift. In accordance with Harwood Arlington, Inc.'s policy, Young was not responsible for rechecking the stability of the van on the lift once any work had begun on the van.

While repairing the van's air conditioner, Young partially lowered the van to install a part; however, the full weight of the van remained on the rack so that resetting the rack was unnecessary. After replacing the part, Young raised the van to finish the job. Young was under the front passenger area of the van, although not touching it, when the front support arms of the lift "kicked out," dropping the front undercarriage of the van directly on Young's head. The van remained suspended with Young literally supporting its front end while the back wheels clung to the rack.

Young testified that it was Jewell's error that caused the accident. Mike Kuss, Harwood Arlington, Inc.'s general manager at the time of the accident, testified that "[w]e don't know who did what." After the accident, Kuss completed an accident report indicating the cause of the accident as "rack slipped." Later, Roszell, who was out of town when the accident occurred, read the report and altered it by adding the words "employee error." Kuss testified that Roszell tried to influence him that the accident was Young's fault, but Kuss disagreed.

Young received his first safety manual at Harwood Arlington, Inc. in May 1992 at the

same time as the restructuring. Young had never been provided with a safety manual during his prior employments as an auto technician. The safety manual contained no information relating to the type of lift involved in the accident, a globe lift. Instead, the manual addressed a different type of lift, a rotary lift, which was similar in design to the globe lift. Harwood Arlington, Inc.'s employees were never provided with instructions regarding how to properly operate the globe lift or with safety information or warnings on the globe lift. They were not given safety information or warnings from manufacturers or from any other source about the risks associated with placing vehicles on the lifts. As an experienced auto technician, however, Young had worked with all different types of lifts before coming to work at Harwood Arlington, Inc.

Roszell testified that HTI and Harwood Arlington, Inc. had a duty to furnish Harwood Arlington, Inc.'s employees with a safe place to work. He further testified that improperly positioning a vehicle on a hydraulic lift created a dangerous condition and an unsafe place to work.

After two unsuccessful back surgeries, Young's treating neurosurgeon testified that he will never be pain free and probably will never return to the type of work he had done for nine years before the accident. Young tried unsuccessfully to return to his job as service manager at Harwood Arlington, Inc., but could not do so because of the debilitating back injuries he sustained during the accident.

This evidence shows that Harwood Arlington, Inc. had the duty to provide Young with a safe place to work, that Young's work place was unsafe, and that Young was injured as a result. The evidence was both legally and factually sufficient to support the jury's negligence finding. We overrule points six and seven.

### CONCLUSION

We affirm the judgment of the trial court.