

NUMBER 13-12-00117-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LANDMARK LAND COMPANY, INC. AND            **Appellants,**
WILLIAM  VAUGHN A/K/A WILLIAM W. VAUGHAN III,

**v.**

R. SEBASTIAN BENNETT, PH.D.,            **Appellee.**

### On appeal from the 404th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

Appellants, Landmark Land Company, Inc. ("Landmark") and William Vaughn III

("Vaughn") a/k/a William W. Vaughan III, bring this accelerated, interlocutory appeal of

the trial court's order denying their special appearances.  *See* TEX. CIV. PRAC. & REM

CODE ANN. § 51.014(a)(7) (West Supp. 2011).  By three issues, appellants contend that:

(1) Vaughn is not subject to the specific jurisdiction of the trial court; (2) the fiduciary shield doctrine protects Vaughn from the exercise of general jurisdiction over him; and (3) there is no evidence establishing personal jurisdiction over Landmark under the alter ego theory. We affirm.

## I. BACKGROUND

In August 2011, appellee, R. Sebastian Bennett, Ph.D., sued South Padre Island Development, L.P. ("SPID, LP"), South Padre Island Development, L.L.C. ("SPID, LLC"), Landmark, South Padre Island Golf Villas Association ("the Association"), and Vaughn.[1] Bennett alleged that he suffered damages when he was induced to purchase a home at South Padre Island Golf Course, a development in Laguna Vista, Texas, on the misrepresentation that the home was covered by "all risk" insurance, when it was not. Bennett claimed that a misrepresentation was specifically made to him by SPID, LP through SPID, LLC that the "all risk" insurance coverage covered replacement costs from any damage to the home, including windstorm and flood damage. The alleged misrepresentation occurred in Texas. Bennett further alleged that Landmark controls the operations of SPID, LP and SPID, LLP and makes all contractual decisions for those entities, including the selection of insurance. Bennett claimed that in February 2010, he noticed problems with water pooling toward his home after a rain storm. In June 2010, after a heavy rain storm, Bennett noticed that portions of the drywall and flooring in the home were saturated with water. In the course of reporting the damage to his insurance agent, Bennett learned that his insurance claims would not be paid because his insurance coverage did not cover all risks and did not cover many of the losses he had suffered.

---

[1] Out of these defendants, only Vaughn and Landmark are parties to this interlocutory appeal.

2

Vaughn filed a special appearance in which he asserted that: (1) Bennett's petition alleges that he (Vaughn), as Landmark's officer and legal counsel, was involved in the decision not to procure the "all risk" insurance, and therefore, Bennett appears to be contending that Vaughn is subject to specific jurisdiction; (2) Bennett has not alleged the type of contacts that would support general jurisdiction over Vaughn; and (3) Bennett has made no allegations that would support jurisdiction over Vaughn under an alter ego theory. Vaughn supported his special appearance with his own affidavit, in which he stated that he is not a resident of Texas, does not individually conduct business in Texas, owns no property in Texas, has no telephone listing in Texas, and has no agent in Texas with authority to conduct business on his behalf. He further stated that he made no representation to Bennett either in his individual or representative capacity pertaining to Bennett's claims.

Landmark filed a special appearance in which it asserted that it conducts no business in Texas, has not entered into a contract with a Texas resident, owns no property in Texas, has no telephone listing in Texas, and has no employees in Texas. Landmark further asserted that Bennett failed to: (1) adduce proof that jurisdiction over Landmark can be sustained on the basis of an alter ego theory, (2) allege that Landmark is subject to specific jurisdiction, or (3) allege that Landmark is subject to general jurisdiction. Landmark attached the affidavit of Vaughn, in which he additionally asserted that the daily operations of Landmark and the other corporate defendants are separate, that the corporations file separate income tax returns, maintain separate books and accounts, and conduct separate shareholder and directors' meetings.

On January 18, 2012, the trial court held a hearing on Vaughn and Landmark's

3

special appearances. Appellants called one witness, Vaughn; Bennett called three witnesses: Mark Kerney, Debbie Camacho, and Justin Awtrey. We summarize the pertinent testimony adduced at the hearing below.

## A. William Vaughn

Vaughn testified that he is employed by DPMG, Inc., a Delaware corporation with its principal place of business in Maryland; DPMG, Inc. is a subsidiary of Landmark. Landmark is a Delaware corporation with its principal place of business in Maryland. Landmark is a holding company that has no employees and has been engaged in the development of property since the early 1970s. Vaughn is an officer and director of Landmark. SPID, LLC is also a subsidiary of Landmark. According to Vaughn, he has never been a resident of Texas and has never owned property or conducted business in Texas. Vaughn testified that he had never made any representations regarding Bennett's home and he has never spoken to Bennett.

On cross-examination, Vaughn stated that he is the president, general counsel, and a member of the board of directors of Landmark. Vaughn testified that SPID, LP was converted into SPID, LLC in the "mid-2000s."[2] Pursuant to questions from the trial court, Bennett's counsel stated that Bennett purchased his condominium from SPID, LLC, which is a subsidiary of Landmark, but Bennett alleges that the subsidiaries are controlled and directed by Landmark. Vaughn testified that Mark Kerney, the director of the SPID golf course, was sent to the site by Landmark. According to Vaughn, Landmark owns no property and has no employees; its subsidiaries build golf courses. In the case of the Laguna Vista project, SPID, LP—later changed to SPID, LLC—owned

---

[2] Vaughn testified that the LP was converted into an LLC in 2006 to take advantage of the change in the Texas franchise tax administration.

4

and operated the property.

Bennett's counsel questioned Vaughn about Plaintiff's Exhibit 8, a three-page print-out depicting Landmark's website. The website identifies Landmark as "Golf, Resort & Community Developers." It refers to the experience of "Landmark's management team" and states that "Landmark's greatest asset has always been its employees," specifically noting that it "has employed each of the 15 top corporate officers for over 20 years." The website identifies Justin Awtrey as project director of the South Padre Island Golf Club. Vaughn confirmed that Awtrey is in charge of the operations at the South Padre Island Golf Club in Laguna Vista and serves on the Association's board as the representative of the developer, SPID, LLC.

Vaughn said that over the years, he had two or three discussions with Dave Hall, then an insurance agent with Coleman, Hall & Heinze insurance agency in Port Isabel. Vaughn denied being involved in the placement of insurance coverage for the Golf Villas Condominiums, but admitted that he discussed the condominium insurance coverage with Hall. Vaughn testified that the Association requested Hall to provide the broadest insurance coverage available for the condominiums, but that there are always exclusions in insurance policies. After Hurricane Katrina, for example, wind-driven rain became a common exclusion and coverage for it could not be purchased. At the time, no coverage was available to the Association for wind-driven rain. Hall sometimes attended the Association's meetings to explain various coverage options and upgrade options available to individual homeowners for additional coverage of their personal property. Vaughn stated that the insurance company determined that the damage to Bennett's residence resulted from high winds that blew water through the windows.

5

Multiple units sustained water damage from rain blowing through shingles or through windows, and the insurance company took the position that its exclusion precluded reimbursement for that type of damage.

Vaughn testified that SPID, LLC is a Delaware corporation that is licensed to do business in Texas. Vaughn is a vice president of SPID, LLC. Vaughn confirmed that DPMG, Inc. is authorized to do business in Texas and has the same office and corporate officers as Landmark and SPID, LLC. Bennett's counsel introduced into evidence a flyer showing the various types of residences available at the Laguna Vista development; the flyer identifies the development as "A Landmark Land Community." Vaughn testified that Bennett's residence is a townhouse. Mark Kerney, then an employee of SPID, LP, came to Texas in 1996.

Vaughn stated that he traveled to Laguna Vista for director's meetings "every three months or so." Vaughn estimated that he has made 20 or 30 business trips to Cameron County, each lasting a couple of days, on business related to the Laguna Vista development. On occasion, other corporate officers visited the area; Gary Kerney, an employee of DPMG, Inc. (father of Mark Kerney, co-manager of the South Padre Island Golf Development), traveled to the site occasionally. Vaughn stated that "probably" four of the five top corporate officers of DPMG, Inc. and Landmark are the same people. Vaughn also said that Gerald Barton, the CEO and chairman of Landmark, has been to the Laguna Vista development, and that "up until three or four years ago," Landmark regularly held its shareholders' meetings at Laguna Vista.

On re-direct examination, Vaughn clarified that he never made any representations to Bennett, and Landmark could not have made any such

6

representation because "[t]here was nobody at Landmark to make representations."

**B.      Mark Kerney**

Kerney testified that he was sales and marketing director or vice president of SPID, LLC.  Kerney stated that his father, Gary Kerney, was senior vice president of Landmark.  Kerney testified that the relationships of the various Landmark subsidiaries are "very complicated" and that he does not "know the details."  He confirmed that Landmark's trademark emblem, the orange oak tree, has always been used by SPID, LLC.  Kerney stated that Landmark made the decision to develop the golf course project at Laguna Vista and set up various companies to carry out the project in Cameron County.  Kerney stated that there were corporate meetings for various corporations held at Laguna Vista, but he did not know which entities.  In the "early days," Kerney said that his paychecks came from Landmark's offices.

On cross-examination, Kerney clarified that his paychecks were issued by "New Delos Partners" and "South Padre Island Development."

**C.      Debbie Camacho**

Camacho testified that she is the custodian of records at Coleman, Hall & Heinze.  She stated that Hall, now deceased, handled the insurance account with the South Padre Island Golf Course properties; Hall handled the account from his office or by meeting people at the Laguna Vista golf course.

**D.      Justin Awtrey**

Awtrey testified that his father is Jim Awtrey, who is a board member and former officer of Landmark.  Awtrey stated that he works at the South Padre Island Golf Club Development and is SPID, LLC's representative on the Association's board.  Awtrey

7

stated that, in accepting the position as project manager for the golf course, he spoke to Gary Kerney, then executive vice president of Landmark. He said that Gary Kerney, in his capacity as Landmark vice president, "oversaw the project down here." Awtrey confirmed that the Association negotiated the insurance coverage for the Golf Villas through Coleman, Hall & Heinze. According to Awtrey, Vaughn actually made decisions regarding the types of insurance coverage that were obtained for the Golf Villas property.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

The issue on appeal is whether the trial court erred in denying appellants' special appearances. Issues of personal jurisdiction are questions of law and reviewed de novo. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). The plaintiff has the initial burden to "plead sufficient allegations to confer jurisdiction." *Id.* Once that burden is met, the defendant seeking to avoid the court's jurisdiction takes on the burden to negate "all potential bases for jurisdiction pled by the plaintiff." *Id.* Where, as here, the lower court does not make findings of fact and conclusions of law in support of its ruling, "all facts necessary to support the judgment and supported by the evidence are implied." *Id.*

Non-residents are subject to the personal jurisdiction of Texas courts if: (1) jurisdiction is authorized under the state's long-arm statute; and (2) it comports with guarantees of the U.S. and Texas Constitutions. *Id.* (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). Under Texas's long-arm statute, a non-resident defendant is within the court's jurisdiction if the defendant

8

conducts business in the state.  *See PHC–Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007) (noting that the long-arm statute's language extends as far as the U.S. and Texas Constitutions permit, so courts should also rely on due process precedents as guides).  Thus, the exercise of personal jurisdiction is constitutional when:  (1) the non-resident defendant has established minimum contacts with the forum; and (2) the exercise of jurisdiction follows the traditional notions of fair play and substantial justice.  *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Texas Supreme Court recently expanded on the meaning of the phrase "fair play and substantial justice":

> Although this "fair play" and "substantial justice" test is well known to appellate courts, the expression is imprecise.  It gains meaning, however, when viewed in light of the "minimum contacts" a defendant has with the forum.  Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point.  When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts.

*Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010) (citations omitted).

"A defendant's contacts with a forum can give rise to either specific or general jurisdiction."  *Id.* (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)).  "General jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state."  *Id.* (citing *CSR*, 925 S.W.2d at 595).

The *Spir Star* court also restated the principles governing specific jurisdiction:

> A court has specific jurisdiction over a defendant if its alleged liability arises from or is related to an activity conducted within the forum.  *CSR*, 925 S.W.2d at 595.  Unlike general jurisdiction, which requires a "more demanding minimum contacts analysis," *id.* at 595, specific jurisdiction

9

"may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002). In such cases, "we focus on the 'relationship among the defendant, the forum[,] and the litigation.'" *Moki Mac*, 221 S.W.3d at 575–76 (quoting *Guardian Royal* [*Exch. Assurance, Ltd. v. English China Clays, P.L.C.*,] 815 S.W.2d [223], 228 [(Tex. 1991)]. Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *See Retamco*, 278 S.W.3d at 338.

*Spir Star*, 310 S.W.3d at 873.

### III. DISCUSSION

In his original petition, Bennett pleaded that Landmark "makes all major contractual decisions" for SPID, LLC and the Association, including the "selection of and placement of insurance for properties within the association, including the home purchased by Plaintiff." Bennett pleaded that Landmark, acting through Vaughn, made the decision not to procure insurance coverage in compliance with the Association's strict requirements. Bennett also pleaded that SPID, LP and SPID, LLC were "acting at the control and direction of Landmark" when they misrepresented the scope of the insurance coverage on Bennett's home. We conclude that Bennett's pleadings were sufficient to satisfy his initial burden because they alleged facts that would support specific jurisdiction, and thus shifted the burden to appellants to negate all potential bases alleged. *See El Puerto de Liverpool v. Servi Mundo Llantero*, 82 S.W.3d 622, 629 (Tex. App.—Corpus Christi 2002, pet. dism'd w.o.j.).

### A. Specific Jurisdiction Over Vaughn

By their first issue, appellants contend that the trial court did not have specific jurisdiction over Vaughn because there is "no connection between Vaughn's contacts

10

with Texas and the operative facts of the litigation." Appellants further argue that although Vaughn admitted that he discussed the insurance coverage for the properties with Hall, "that contact is not substantially connected to the operative facts of the litigation."

We disagree. As noted, specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *Spir Star*, 310 S.W.3d at 873. The gravamen of Bennett's complaint is that he purchased his home based on the representation by SPID, LLC that it was covered by "all risk" insurance, when it was not, and that Landmark, acting through Vaughn, made the decision not to procure the "all risk" insurance coverage as represented. Vaughn testified that he traveled to the Laguna Vista development "every three months or so" for director's meetings, for a total of twenty or thirty trips, each lasting a couple of days. Vaughn also admitted that "over the years," he had several discussions with Hall regarding the insurance coverage for the Laguna Vista properties. Significantly, Awtrey testified that Vaughn actually made decisions regarding the types of insurance coverage obtained for the Golf Villas property. We conclude that this evidence shows that, considering only Vaughn's contacts with Texas, his contacts with Texas were purposeful and the cause of action arose from or related to his contacts with Texas. *See id.* We hold that Vaughn had the necessary minimum contacts sufficient to allow Texas courts to assert specific jurisdiction over him.

We must now determine whether jurisdiction is consistent with traditional notions of fair play and substantial justice. *See id.* at 878.

11

"'Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.'" *Id.* (quoting *Guardian Royal*, 815 S.W.2d at 231). To evaluate this component, we consider Vaughn's contacts in light of: (1) "the burden on the defendant"; (2) "the interests of the forum state in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies. *Id.* To defeat jurisdiction, appellants must present "'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Id.* at 878–79 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Requiring Vaughn to defend Bennett's claim in Texas would not impose an undue burden on him. *See id.* at 879. Vaughn testified that he travels to Texas for director's meetings "every three months or so." Secondly, Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains as a result of misrepresentations regarding insurance coverage. *See id.* Third, Bennett has an interest in resolving the controversy in Texas because that is where the alleged misrepresentation and damage occurred. *See id.* The fourth and fifth factors are not particularly applicable. We conclude that the burden on appellants of defending against the suit is minimal, and is outweighed by Bennett's and Texas's interests in adjudicating the dispute here. *See id.* at 879–80. Asserting personal

12

jurisdiction over Vaughn comports with traditional notions of fair play and substantial justice. *See id.* at 880.

We hold the trial court correctly concluded that it had personal jurisdiction over Bennett's claims against Vaughn. We overrule appellants' first issue.

**B. Fiduciary Shield Doctrine**

By their second issue, appellants contend that the fiduciary shield doctrine protects Vaughn from the exercise of general jurisdiction over him. Because we have already determined that the trial court properly exercised specific jurisdiction over Vaughn, we need not determine whether he was subject to the court's general jurisdiction. *See* TEX. R. APP. P. 47.1.

**C. Jurisdiction Over Landmark**

By their third issue, appellants contend that no personal jurisdiction can be imputed to Landmark pursuant to an alter ego theory. Specifically, appellants argue that the evidence does not establish that Landmark exercised a degree of control over SPID, LLC greater than that normally associated with common ownership and directorship. *See Spir Star*, 310 S.W.3d at 873–74 (citing *PHC–Minden,* 235 S.W.3d at 172).

A parent company and its subsidiary may be "fused" for jurisdictional purposes if the plaintiff proves that "the parent controls the internal business operations and affairs of the subsidiary." *BMC Software*, 83 S.W.3d at 799. "But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *Id.* A

13

parent company cannot be subjected to personal jurisdiction based on the local activities of its subsidiary when "the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent and is not acting as merely one of its departments . . . ."  4A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.4 (3d ed. 2002).  "[T]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities [must] prove this allegation, because Texas law presumes that two separate corporations are distinct entities."  *PHC—Minden*, 235 S.W.3d at 173.

Appellants argue that the evidence does not show that Landmark exercised a degree of control over SPID, LLC greater than that normally associated with common ownership and directorship.  Bennett points to the following in support of his argument that Landmark and its subsidiaries are fused into one operation:  (1) Landmark includes its subsidiaries in presenting consolidated financial statements in its Securities and Exchange Commission (SEC) 10-Q filings; (2) in marketing its properties through its website, Landmark identifies the Laguna Vista development as a "Landmark" project; (3) Mark Kearny was directed to the Laguna Vista development by his father, Gary Kearney, and by Doug Barton, the son of Gerald Barton, chairman and CEO of Landmark; (4) Vaughn testified that Landmark made the decision to acquire the Laguna Vista property; (5) Mark Kearney testified that decisions regarding the development were approved by Landmark; and (6) Landmark utilizes its logo, an oak tree, on its internet marketing materials to "brand" its golf course resort communities, and the

14

marketing flyer for the South Padre Island Golf Club identified the development as a "Landmark Land Community."

In response, appellants argue that federal securities regulations permit a registrant to file with its consolidated subsidiaries, and that the consolidated filing is not evidence that Landmark exercised a degree of control over SPID, LLC greater than that normally associated with common ownership and directorship.

Vaughn's affidavit, attached to Landmark's special appearance, states, in pertinent part:

> Defendant Landmark Land Company, Inc. and the other corporate Defendants are distinct and adequately capitalized financial units and are separate by [sic] incorporated and maintained. The daily operations of Defendant Landmark Land Company, Inc. and the other corporate Defendants are separate. The other corporate Defendants file income tax returns separate from the consolidated return filed by Defendant Landmark Land Company, Inc. Defendant Landmark Land Company, Inc. and the other corporate Defendants maintain separate books and accounts. Defendant Landmark Land Company, Inc. and the other corporate Defendants conduct separate meeting[s] of their shareholder[s] and directors.

The Texas Supreme Court has relied on the following factors in determining whether a subsidiary is "separate and distinct from its parent corporation for personal jurisdiction purposes":  (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *PHC–Minden*, 235 S.W.3d at 175 (citing 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4).  Ultimately, the evidence must establish that the two entities are not factually and legally separate and the corporate

veil should therefore be pierced to prevent fraud or injustice. *BMC Software*, 83 S.W.3d at 799.

Parent companies normally exercise at least some control over their subsidiaries, and "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975). The Texas Supreme Court has held that "'[a]ppropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies.'" *PHC–Minden*, 235 S.W.3d at 176 (quoting 16 MOORE'S FEDERAL PRACTICE § 108.42[3][b]). To pierce the corporate veil in the personal-jurisdiction context, there must be "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)).

Here, the evidence shows that SPID, LLC is a wholly-owned subsidiary of Landmark. Landmark has its corporate headquarters in Maryland. Plaintiff's Exhibit No. 10, a copy of SPID, LLC's "Texas Franchise Tax Public Information Report," shows that SPID, LLC's "principal office" address is the same as Landmark's. There is little evidence in the record regarding the observance of corporate formalities, other than Vaughn's assertion in his affidavit that the companies maintain separate books and conduct separate meetings. Although not evidence of the absence of corporate formalities, Landmark's marketing flyers and website marketing deliberately obfuscated any distinction between the entities by identifying the Laguna Vista project as a

16

Landmark development. The evidence that Landmark exercised a degree of control over SPID, LLC greater than that normally associated with common ownership and directorship is: (1) Mark Kearney's testimony that Landmark made the decision to purchase the property and develop it as a golf resort and that Landmark approved decisions regarding the golf course development; (2) up until the last three or four years, Landmark regularly held its shareholders' meetings at Laguna Vista; and (3) Awtrey's testimony that Gary Kerney "oversaw" the Laguna Vista project in his capacity as Landmark's executive vice president.

We conclude that this evidence constitutes some evidence that Landmark and SPID, LLC may be fused for jurisdictional purposes. *See Spir Star*, 310 S.W.3d at 880 ("Under the appropriate standard of review, our task ends when, as here, some evidence supports the trial court's denial of AG's special appearance."). Because Bennett pleaded allegations sufficient to confer jurisdiction under an alter ego theory, appellants had the burden to negate that basis for jurisdiction. *See Retamco*, 278 S.W.3d at 337. We conclude that appellants failed to negate the alter ego basis for jurisdiction. *See id.* We hold that the trial court did not err in exercising personal jurisdiction over Landmark under an alter ego theory. We overrule appellants' third issue.

As noted, Bennett pleaded an alter ego theory by alleging that Landmark "makes all major contractual decisions" for SPID, LLC and the Association. He further pleaded specific allegations of misrepresentation and fraudulent conduct by SPID, LLC "acting at the control and direction of Landmark." In its special appearance, Landmark argued that it was not subject to the court's general or specific jurisdiction and that personal

17

jurisdiction could not be exercised over it under an alter ego theory of jurisdiction. Construing Bennett's pleadings liberally as pleading allegations which confer general jurisdiction over Landmark itself, we address Landmark's assertion in its special appearance that it is not subject to the court's general jurisdiction.

General jurisdiction is subject to a "dispute-blind" analysis—without regard to the nature of the claim—and involves a "more demanding minimum contact analysis." *PHC–Minden*, 235 S.W.3d at 168. However, the requisite level of minimum contacts must be substantial and involve a defendant who has been engaged in longstanding business with the forum state. *Id.* In a minimum contacts analysis, the threshold issue to determine is whether the foreign corporation has "continuous and systematic general business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). Continuous and systematic contacts are determined only on a "case-by-case basis" and should be examined for the quality of the contacts, rather than the quantity. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 810 (Tex. 2002).

The second prong of a general jurisdiction analysis requires the court to evaluate "whether the assertion of personal jurisdiction comports with fair play and substantial justice." *Guardian Royal*, 815 S.W.2d at 228. To make this evaluation, the court is advised to look at several factors, including: (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Id.*

18

Vaughn is president, general counsel, and a member of Landmark's board of directors. Vaughn testified that "up until three or four years ago," Landmark regularly held shareholders' meetings at Laguna Vista. As noted above, Vaughn testified that he has made twenty or thirty business trips to Texas related to the Laguna Vista development. Awtrey testified that Gary Kerney "oversaw" the Laguna Vista project in his capacity as Landmark's executive vice president. We hold that these contacts, which are more than isolated, rise to a sufficient level that are continuous and systematic to satisfy general jurisdiction. *See Spir Star*, 310 S.W.3d at 872 (noting that general jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state).

Having found that Landmark had minimum contacts with the state of Texas, we must decide whether subjecting it to jurisdiction here would violate "traditional norms of fair play and substantial justice." *See Guardian Royal*, 815 S.W.2d at 228 (listing factors to consider).

Viewing the facts through the prism of the factors, we conclude that traditional norms of fair play and substantial justice are not violated by subjecting Landmark to jurisdiction in Texas. First, although it may be somewhat burdensome for Landmark to litigate in Texas (rather than in Maryland, where its corporate office is located), the burden is outweighed by the fact that all of the alleged misrepresentations took place in Texas, and therefore, the majority of the documents and witnesses necessary for trial are in Texas. Moreover, the burden on Landmark must be viewed in light of the fact that "up until three or four years ago," it regularly held its shareholders' meetings in Laguna Vista. *See id.* at 232 (noting that "the interests of the forum state and the

plaintiff will justify the severe burden placed upon the nonresident defendant"). The second and third factors—the interests of Texas and Bennett—also favor jurisdiction in Texas. Texas has an interest in adjudicating the dispute because the claim was filed by a Texas resident and involves alleged misrepresentations and fraudulent conduct that occurred in Texas. *See id.* at 232–33. Bennett's interest is served by having his claims adjudicated in Texas, where he resides and where the alleged misrepresentations and fraudulent conduct occurred. *See Pessina v. Rosson*, 77 S.W.3d 293, 299 (Tex. App.—Austin 2001, pet. denied). The interests of the interstate judicial system indicate that Texas is the proper forum. Again, Bennett's claims are based on misrepresentations which were allegedly committed in Texas and allegedly fraudulent conduct that occurred in Texas. *See id.* These same reasons relate to the fifth factor, the shared interest of the respective states in furthering substantive social policies.

Based on the preceding factors, we conclude that the exercise of personal jurisdiction over Landmark comports with fair play and substantial justice. *See Spir Star*, 310 S.W.3d at 872. We hold that the trial court did not err in exercising general jurisdiction over Landmark.

## IV. CONCLUSION

We hold that the trial court did not err in denying Landmark's and Vaughn's special appearances. We affirm.


DORI CONTRERAS GARZA
Justice

Delivered and filed the
20th day of September, 2012.

20